Carroll,
Nov. 7, 1939. } No. 3113.

MARION WELCH *v.* FRISBIE MEMORIAL HOSPITAL.

ROBERT WELCH *v.* SAME.

*Arthur A. Greene* and *William N. Rogers* (*Mr. Rogers* orally), for the plaintiffs.

*Theo S. Jewett,* *Leonard C. Hardwick, Wyman, Starr, Booth, Wadleigh & Langdell* (*Mr. Wyman* orally), for the defendant.

BRANCH, J.   In support of its motions for a nonsuit and a directed verdict, the defendant contended that the technician who took the x-ray plates of plaintiff's leg was not the servant of the hospital. The basis of the court's order denying the motions was not stated at the time it was made, but it is clearly disclosed by the language of the charge.   The jury was instructed that "the relation of master and servant existed between the hospital and Miss Toomey."   It thus appears that the Presiding Justice himself determined the nature of the relationship between the technician and the hospital,

and it is to be inferred that his denial of defendant's motions was predicated upon this finding. Since the facts in regard to Miss Toomey's employment were not in dispute, it was proper for the trial court thus to pass upon the nature of the relationship between her and the defendant, (Restatement of Agency, s. 220, *com. b;* 2 Mechem, Agency, s. 1864) and we find in the record no reason to doubt that the court correctly evaluated the various factors which properly entered into a solution of the problem (Restatement of Agency, s. 220) and arrived at a correct result. It follows that the defendant's motions, so far as they were based upon the ground above stated, were properly denied.

We, therefore, have squarely presented the question whether a hospital organized and maintained as a charitable institution, can be held liable to a patient for injuries sustained as a result of the negligent conduct of its servants. With reference to a different factual situation the above question was considered in *Hewett* v. *Association*, 73 N. H. 556, and it has received elaborate consideration in other jurisdictions. For collections of cases upon the subject see 48 Yale L. J. 81; and Appelman, Tort Liability of Charitable Institutions, 22 American Bar Association Journal, 48. In a majority of American jurisdictions liability is denied, although, as stated by counsel for the defendant, "The basis of the decisions varies. Some deny liability upon the so-called trust fund theory that the money is devoted to charity and is not to be expended in payment of tort liability; some on the waiver theory that a person who accepts the charity waives any right of action; and some on a broad question of public policy that the recipient of charity cannot maintain an action in the absence of showing fault with reference to the employment of the persons charged with negligent conduct."

In *Hewett* v. *Association, supra,* the trust fund theory was examined at length and discarded as unsound. Obviously, it cannot help the plaintiff in the present case.

As pointed out by an eminent authority on the law of trusts, the waiver theory has no substantial basis in fact, (3 Scott, Trusts, s. 402) and does not commend itself to us as a basis of decision.

We think it is equally clear that hospitals cannot properly be relieved of liability for the negligence of their servants upon any theory of public policy. In this jurisdiction the declaration of public policy with reference to a given subject is regarded as a matter primarily for legislative action, (*Heath* v. *Heath*, 85 N. H. 419; *Spead* v. *Tomlinson*, 73 N. H. 46) and although judicial power undoubtedly

exists "to declare public policy unsupported by legislative announcement of it . . . the policy must be based on 'a thoroughly developed, definite, persistent and united state of the public mind' . . . . There must be no substantial doubt about it." *Heath* v. *Heath, supra,* 433. With regard to the tort liability of charitable hospitals, we are aware of no such "state of the public mind" as is above described. On the contrary, so many competing considerations of policy have been suggested that it is extremely difficult to determine whether the public interest will best be served by a rule relieving hospitals from tort liability or by the application of the ordinary rules of agency. These competing considerations of policy are well summarized in *Sheehan* v. *Hospital,* 273 N. Y. 163.

If the trust fund theory tends to encourage philanthropically minded people to establish charitable institutions, and if it could be demonstrated that the imposition of tort liability tends to discourage such undertakings, a matter which now lies wholly in the realm of speculation, it may be answered "that to impose liability is to beget careful management; and that no conception of justice demands that an exception to the rule of *respondeat superior* be made in favor of the resources of a charity and against the person of a beneficiary injured by the tort of a mere servant or employee functioning in that character." *Sheehan* v. *Hospital, supra.* In the absence of a legislative declaration of policy upon the subject, and in the presence of an indefinite and confused state of the public mind, we do not feel justified in announcing a rule of non-liability based upon considerations of public policy.

We, therefore, conclude that this case is governed by the ordinary rules of agency, including the principle of *respondeat superior,* and that the action of the trial court in submitting it to the jury on this basis was correct.

The defendant sought to introduce evidence of the fact that Mr. Rogers, one of the plaintiffs' attorneys at the trial, was also counsel for Dr. Almond, the roentgenologist who examined the x-ray plate of the plaintiff's leg, and whose conduct was an issue in the case. This evidence was excluded and the defendant excepted. This ruling of the court presupposed a finding by him that the offered evidence would not have assisted the jury in ascertaining the truth of the present controversy. Such a discretionary ruling ordinarily raises no question of law for this court and the present case is not exceptional. The defendant's exception is, therefore, overruled.

In the course of his argument to the jury, counsel for the defendant

made the following statements: "The hospital, the Frisbie Memorial Hospital, I submit to you, is a place to which doctors may bring their patients, where patients may receive attention under the direction and control of their own physicians . . . . Now we say—and when I say we I am speaking for the hospital—the hospital wasn't there in person. The only person representing the hospital was Miss Toomey." In reply to this argument, counsel for the plaintiffs used the following language: "Why, my brother Wyman says this hospital isn't an acting individual, just a set of buildings with some facilities in them. Why Gentlemen of the Jury, this hospital is a corporation, duly authorized by law and you will see from its own letterhead that it has a president . . . a treasurer, a secretary, and a clerk. It has a chairman of its board of trustees." To the allowance of this argument the defendant duly excepted. The documentary evidence before the jury clearly sustained the argument of plaintiffs' counsel and the defendant, therefore, takes nothing by this exception.

The defendant seasonably requested the court to charge the jury as follows: "The mere fact that the hospital owned the x-ray apparatus does not, in itself, render it liable." The court failed to give the requested instruction and the defendant excepted. Nowhere in the evidence do we discover the slightest suggestion of a claim on the part of the plaintiffs that the defendant was liable by reason of its ownership of the machine. It is perfectly obvious that the trial judge should confine his instructions to the issues raised by the parties at the trial. "The effect of the requested instruction would . . . have been to give apparent importance to a wholly inconclusive issue," (*Wemyss* v. *Company*, 86 N. H. 587, 593) and for this reason it was properly denied.

Following the instructions of the court to the jury, defendant's counsel claimed certain exceptions to the charge, and also made the following statement: "*Mr. Wyman:* The defendant respectfully calls the court's attention to the fact that on the court's instructions on the burden of proof the court failed to instruct the jury that if the evidence was evenly balanced the verdict should be for the defendant, because the duty is upon the plaintiffs to overcome the balance of probabilities." It is now asserted that this form of words should be interpreted as an exception to the charge. The reason why experienced counsel should claim this indulgence of the court is not understood, and we are not disposed to grant it. It is clear, however, that if the statement of counsel were given effect as an exception to the charge, the defendant would not be benefited. No request for

instructions as to the duty of the jury in case the evidence should appear to be evenly balanced was made prior to the charge. The claimed exception was at most an exception to an asserted omission to charge upon this point. The jury was told in unmistakable terms that "the burden of proof is upon the plaintiffs . . . to persuade you gentlemen that it is more probable than otherwise that their contentions are true . . . . The burden of proof is upon the plaintiffs to persuade you that it is somewhat more probable than otherwise that Mrs. Welch's condition is due to the negligence of Miss Toomey. That, essentially, is the claim here, and it is the duty of the plaintiffs to persuade you by a balance of probabilities that it is so. If they fail to persuade you to that effect it is your duty to render a verdict for the defendant."

Having thus correctly defined the burden resting upon the plaintiffs, the failure of the court to state as a corollary of the instructions already given that an even balance of the evidence was not equivalent to a preponderance of the evidence, cannot be regarded as a fatal error in the absence of a specific request that such an instruction be given. Such was the conclusion of this court in *Glidden* v. *Company*, 88 N. H. 4, 8, where a similar situation was involved.

The verdicts must be set aside, however, because of the trial court's failure to deal adequately with certain of the defendant's requests for instructions.

The defendant seasonably requested the court to charge the jury as follows: "14. If Dr. Grigg examined the x-ray plate either alone or with Dr. Almond and saw that it did not include the lower end of the leg bones and the ankle joint and did not treat for the fracture, his conduct was careless and the cause of the plaintiff's injury for which the hospital is not at fault." Although this precise form of words may be open to objection, the request clearly called attention to one of the defendant's principal contentions, *i.e.* that the plaintiff's injuries were due to the neglect of the surgeon in charge of her case rather than to the fault of the defendant's technician, and indicated clearly the defendant's desire that the law applicable thereto be stated specifically to the jury. Under these circumstances the request could not properly be ignored. "Proper requests for specific instructions which are applicable to the evidence should be granted in some form of language unless the instructions are obviously to be implied from the rest of the charge, and whether general instructions cover them must in some measure be determined by the circumstances and situation of the particular case." *McCarthy* v. *Souther*, 83 N. H. 29, 34.

There was evidence tending to establish the factual basis of the above request. The plaintiff testified that no treatment was given to her ankle until the morning following her injury. There was also testimony that upon that morning, at a time findably before the plaintiff's ankle had been treated at all, Dr. Almond "and Dr. Grigg went over the plates together." Although Dr. Grigg did not profess to be an expert in reading x-ray plates, he nevertheless indicated clearly at the trial his perception of the fact that the plate showing the plaintiff's leg did not show the lower ends of the leg bones or the ankle joint.

The plaintiff's theory of the case rested squarely upon the proposition that Dr. Grigg's mistaken diagnosis and improper treatment of her injuries was induced by his justifiable but erroneous belief that an x-ray plate of the plaintiff's ankle had been taken. If it were established as a fact that before the plaintiff left the hospital and before any treatment had been given to her ankle, Dr. Grigg examined the plate and thus learned that the ankle was not included therein, the foundation of the plaintiff's case would be destroyed. Under such circumstances it could not reasonably be found that his subsequent treatment of her at the hospital or her premature discharge therefrom or his assurances to her that her injury consisted only of a sprain were based upon an assumption by him that an x-ray plate of the ankle had been taken.

The full responsibility for a proper diagnosis and treatment of the plaintiff's injuries rested upon Dr. Grigg as the surgeon in charge of her case. As the trial court correctly charged the jury: "It was the duty of Dr. Grigg as the attending physician to do what reasonable care required to ascertain that the x-rays which Dr. Almond interpreted were x-rays of the portion of the body as to which he suspected a fracture." If, in consequence of the verbal report which he received during the night following the plaintiff's admission to the hospital and his assumption that an x-ray picture of the ankle had been taken, he had come to the conclusion that the plaintiff was suffering only from a sprained ankle, and if his subsequent examination of the plate demonstrated that the ankle was not shown therein, then his legal duty to use due care, coinciding with his professional duty, demanded that he reconsider his original diagnosis in the light of the known facts, and a conclusion that his subsequent treatment of the plaintiff's ankle was still based upon the assumption that an x-ray picture of it had been taken could not reasonably be entertained.

Under such circumstances the case would present itself merely as one in which a physician knowingly undertook to treat an ankle injury without the benefit of an x-ray of the joint. This was his responsibility not that of the hospital. If he had felt the need of other x-rays it is plain that he could have had them upon request.

Instructions upon this point should, therefore, have been correlated with the court's discussion of the subject of causation. We find nothing in the language of the charge to justify the conclusion that instructions upon this point were "obviously to be implied from the rest of the charge," (*McCarthy* v. *Souther, supra*) and the failure of the court to instruct the jury thereon must be regarded as error.

Somewhat similar considerations apply to the defendant's nineteenth request for instructions, which was as follows: "19. If Dr. Grigg received a written report of what the x-ray showed within a week or 10 days after it was taken, and filed it without examining same and did not notify the plaintiff or her physician that the x-ray did not show the ankle, his conduct was careless and was the cause of the injury for which the hospital is not liable." The evidence was uncontradicted that within a few days after the plaintiff left the hospital, the following typewritten report was sent to Dr. Grigg: "Mrs. Robert Welch. Radiographic examination of the left knee and upper 3/5 of the leg shows no evidence of injury from a roentgen standpoint. Signed, Harry M. Almond, M. D. Frisbie Memorial Hospital."

With reference to this report, Dr. Grigg testified upon cross-examination as follows: "Q. And you didn't pay any attention to the report that came in a week later? A. As the patient had been sent home, when the report came in, I put it in my file without making a study of it. . . . Q. Did you write a letter or get any word to her in any way that the record of the hospital was different from what you had understood it to be previously? A. Obviously not. I explained to her that the x-ray report showed that she had no fracture and that she must be under the care of her family physician when she got home." By this and other portions of his testimony, Dr. Grigg clearly indicated his belief that his responsibility for Mrs. Welch's case terminated when she left the hospital. Clearly this was not so. Having taken charge of the case, it was his legal duty to use reasonable care to assist her recovery so long as his attention was reasonably necessary for that purpose or until his services were definitely dispensed with. 21 R. C. L. Tit., Physicians

and Surgeons, *s.* 34; *Ballon* v. *Prescott*, 64 Me. 305; *Dale* v. *Company*, 48 Ark. 188, and note thereto in 3 A. S. R. 224, 228. We have no doubt that so long as the plaintiff's recovery continued to be dependent upon the accuracy of Dr. Grigg's diagnosis, his duty of care persisted. Having informed the plaintiff of his diagnosis and directed her to call on her own physician, he must have realized that the results of his diagnosis would be projected a considerable distance into the future. If he subsequently received information that the assumed basis of his diagnosis was lacking, a finding that due care required that notice thereof be sent to plaintiff would be a proper, if not a necessary, conclusion.

If it be conceded that the first report of x-ray examination made to Dr. Grigg was erroneous and misleading and that the defendant was responsible therefor, it does not follow that the defendant was thereby charged with an inescapable liability for all the *sequelae* thereof. It would be an unduly harsh rule of law to say that an error of this kind could not be corrected, and by analogy to the law of deceit, we think it is plain that the defendant had the privilege, as well as the duty, of correcting any such error by exercising due care to disclose the facts to the recipient of the misleading statement. Such is the clear implication of the authorities upon the law of deceit. *Pettigrew* v. *Chellis*, 41 N. H. 95; 26 C. J., Title, Fraud, *s.* 15; 3 Restatement of Torts, *s.* 535.

If the jury in the present case was satisfied that the above report to Dr. Grigg was adequate to correct any previous misconception on his part, it might be found that the defendant had performed its whole duty and that the chain of causation between the initial fault of the defendant and the subsequent treatment of the plaintiff's ankle had been broken, and for damages subsequently sustained the defendant would not be liable. We think that the jury should have been instructed to this effect and that it was error to ignore completely the defendant's nineteenth request.

During the trial the court ruled that no reference should be made by counsel to the fact that the defendant is a charitable organization. To this ruling the defendant took exception as follows:

"*Mr. Wyman:* . . . As I understand it, the ruling of the Court is that defendant's counsel is not entitled to describe the hospital as a charitable organization or to refer to that in argument. The defendant would like an exception to that ruling.

"*The Court:* Exception noted."

The reason for this ruling is not disclosed by the record, nor is

it understood by this court. The character of the defendant as a charitable organization established for a purpose of public benevolence and dependent upon charity for support was a fact which might well determine the extent of the equipment and the character of the service which the defendant ought to provide. We think that it was a circumstance to be considered by the jury in passing upon the issue of due care, and the defendant's exception to the above ruling is therefore sustained.

*New trials.*

All concurred.